UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SALVATORE R. LASCALA, ESQ.,

Plaintiff,

-v-

GUIDEHOUSE INC., *et al.*,

Defendants.

25-CV-2882 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiff Salvatore R. LaScala, Esq. brings claims of discrimination and retaliation against

Guidehouse Inc., Guidehouse LLP, Guidehouse Holdings LLC (together, "Guidehouse") and two

former supervisors, Scott R. McIntyre and Ellen S. Zimiles, under the Americans with

Disabilities Act (the "ADA"), 42 U.S.C. § 12101 *et seq.*, New York State Human Rights Law

("NYSHRL"), N.Y. Exec. Law § 290, *et seq.*, and New York City Human Rights Law

("NYCHRL"), N.Y.C. Admin Code § 8-101, *et seq.*  LaScala also asserts claims for breach of

contract against Guidehouse Holdings LLC, predicated on LaScala's membership agreement, as

well as breach of the implied covenant of good faith and fair dealing against Guidehouse Inc.,

predicated on LaScala's employment agreement.

Now before the Court is Defendants' motion to dismiss LaScala's First Amended

Complaint (the "Amended Complaint").  (ECF No. 34.)  For the reasons that follow, Defendants'

motion to dismiss is granted in part and denied in part.

1

## I.    Background

### A.    Factual Background

The following facts are taken from LaScala's First Amended Complaint and are presumed true for the purposes of this motion. *See Fink v. Time Warner Cable*, 714 F.3d 739, 740-41 (2d Cir. 2013).

Plaintiff Salvatore R. LaScala, Esq. is an accountant and attorney who specializes in conducting investigations and compliance reviews on behalf of financial institutions. (ECF No. 30 ("FAC") ¶¶ 38, 40-41.) LaScala became an employee of Guidehouse in 2019, after Guidehouse acquired LaScala's former employer, Navigant. (*Id.* ¶ 42.) As part of that acquisition, and pursuant to LaScala's employment agreement with Guidehouse, LaScala became an equity partner and the head of Guidehouse's Global Investigations & Compliance ("GIC") practice.[1] (*Id.*) In this role, LaScala was awarded equity in Guidehouse through various membership interests, which are subject to certain vesting and other conditions outlined in the then-operative Fourth Amended & Restated Limited Liability Company Operating Agreement (the "Fourth Amended Operating Agreement"). (*Id.* ¶ 43.) LaScala was designated an "E-2" level equity partner, considered an industry leader, and tasked with managing a lucrative book of business that generated tens of millions of dollars in revenue for Guidehouse. (*Id.* ¶¶ 44, 47, 55.) LaScala consistently received high marks from Guidehouse during his annual performance reviews. (*Id.* ¶ 54.)

After a business trip abroad in early 2020, LaScala contracted what he suspected was an early case of COVID-19, which left him with kidney issues, chronic migraines, and other

---

[1] Guidehouse LLP's rights and obligations under LaScala's employment agreement were later assigned to and assumed by Guidehouse Inc. (FAC ¶ 42.)

symptoms.  (*Id.* ¶¶ 57-58.)  He dealt with other related health conditions, including fatigue and

difficulty sleeping, throughout 2021; LaScala alerted Guidehouse to his health issues in late

2021, but maintained a regular work schedule.  (*Id.* ¶¶ 58-59.)  In early 2022, LaScala contracted

COVID-19 for a second time, and his health worsened.  (*Id.* ¶ 60.)  Around this time, LaScala

raised his health issues with Ellen S. Zimiles, his then-mentor and supervisor, and a human

resources representative with the aim of seeking a disability accommodation, including a reduced

work schedule.  (*Id.* ¶¶ 45, 60-61.)  These discussions, which continued into 2023, were

inconclusive, and LaScala was not offered any accommodations.  (*Id.* ¶ 61.)

### 1.     Guidehouse Restructurings

In late summer or early fall of 2022, LaScala was informed that Guidehouse would be

moving the "Financial Crime Managed Services" sub-practice, which was composed of 1,200

employees, out of his GIC practice.  (*Id.* ¶ 63.)  The reorganization had the effect of substantially

increasing LaScala's job duties.  (*Id.* ¶ 67.)  A few months later, Scott R. McIntyre,

Guidehouse's CEO, tasked LaScala and Zimiles with preparing and presenting a restructuring

plan to C-suite executives.  The restructuring plan outlined additional reorganizations that would

saddle LaScala with even more managerial responsibilities compared to partners in other

divisions.  (*Id.* ¶¶ 30, 69, 71.)  When LaScala attempted to include material in the presentation

that underscored the success of his GIC practice, presumably to defend against the restructuring,

Zimiles demanded that such information be removed or relegated to the appendix.  (*Id.* ¶¶ 74-

77.)  The presentation was ultimately presented to the executives in abbreviated form.  (*Id.* ¶ 77.)

According to LaScala, after learning of LaScala's health conditions, Zimiles "regularly

marginalized him, foisted additional work on him, and took credit for his continued strong work

and profitable results."  (*Id.* ¶ 78.)  She also allegedly "encouraged senior executives of

Guidehouse to believe . . . that LaScala's health conditions were affecting his performance." (*Id.* ¶ 79.)

### 2.    Zimiles's Retirement

LaScala's health continued to deteriorate into early 2023.  LaScala alleges that "[h]is symptoms came and went, and variously included but were not limited to migraines, kidney issues, fatigue, temporary hearing loss, back and knee problems, coughing and perspiration, and problems sleeping." (*Id.* ¶ 85.)  Despite these health problems, LaScala continued working a rigorous schedule and continued to generate significant revenue for Guidehouse. (*Id.* ¶¶ 87-88.)

Zimiles was scheduled to retire from Guidehouse in mid-2023, so Guidehouse undertook a search for her successor.  Although LaScala "should have been at least a strong potential candidate for the position" because of his industry experience, Zimiles informed him in late November or early December of 2022 that "she and the Company's C-suite team did not think that LaScala's succeeding her was a good idea because of his health." (*Id.* ¶¶ 90-91.)  Around February 2023, Zimiles told LaScala that McIntyre had told her that Guidehouse was worried about LaScala's health. (*Id.* ¶ 95.)

### 3.    LaScala Takes Short-Term Disability Leave

On March 8, 2023, following a fall during a business trip, LaScala applied and was approved for short-term disability leave, slated to begin on March 10, 2023 and end on September 7, 2023. (*Id.* ¶¶ 99-102.)  On that same day, Guidehouse's Chief Human Resources Officer informed Zimiles and others that, despite LaScala's increased workload as a result of the restructuring, Guidehouse would be demoting LaScala from an E-2 to an E-1 partner, effective as of March 12, 2023. (*Id.* ¶¶ 103-104.)  The demotion lowered LaScala's maximum bonus

percentage and "positioned LaScala less well for future promotions, compensation, and equity."

(*Id.* ¶ 105.)

### 4.    Guidehouse Terminates LaScala's Employment

In late spring and summer 2023, while LaScala was on short-term disability leave, he applied and was approved for long-term disability leave, to begin on September 8, 2023—the day after his short-term disability leave ended.  (*Id.* ¶¶ 114-15.)  In early June 2023, LaScala worked with counsel to formally raise potential legal claims against Guidehouse, with the aim of reaching a compromise that would allow LaScala to return to work if and when his health improved with a reasonable accommodation.  (*Id.* ¶ 116.)  As part of these negotiations, Guidehouse drew up a proposed settlement agreement, which would have extended LaScala's employment past a key vesting date in mid-October 2023, and gave him twenty-one days to consider and sign the proposed settlement.  (*Id.* ¶¶ 118-20.)  Before those twenty-one days had elapsed, however, Guidehouse withdrew the proposed settlement offer and fired LaScala on September 8, 2023, pursuant to a provision in his employment agreement allowing for termination based on "disability."[2]  (*Id.* ¶¶ 121, 127.)

### 5.    Bain Capital's Acquisition of Guidehouse

In November 2023, Guidehouse announced that it had entered an agreement to be acquired by Bain Capital.  That acquisition closed around December 14, 2023, for $5.3 billion. (*Id.* ¶¶ 130-31.)  LaScala alleges that, in addition to denying him additional vesting and equity

---

[2] LaScala's employment agreement states that Guidehouse "may terminate this Agreement . . . and Employee's employment upon Employee's Disability."  (ECF No. 30-1 ¶ 3(e).)  The agreement defines "disability" as occurring "if Employee is incapable of performing Employee's services for (i) a continuous period of ninety (90) days and remains so incapable at the end of such ninety (90) day period or (ii) periods amounting in the aggregate to one hundred eighty (180) days within any one (1) period of three hundred sixty-five (365) days and remains so incapable at the end of such aggregate period of one hundred eighty (180) days."  (*Id.*)

opportunities that would have arisen from this acquisition by terminating him before its consummation, Guidehouse "has retaliatorily refused to pay LaScala his corresponding net profit share of the proceeds from the Bain Capital acquisition and refused to pay him other distributions that Guidehouse concedes he is owed." (*Id.* ¶¶ 133, 136.)  LaScala states that these post-termination distributions amount to over $701,000.  (*Id.* ¶ 142.)

### B.    Procedural Background

LaScala filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), New York State Division of Human Rights, and New York City Commission on Human Rights on October 6, 2023.  (*Id.* ¶ 147.)  On January 8, 2025, the EEOC issued LaScala a Notice of Right to Sue (*id.* ¶ 148), and LaScala filed suit in this Court on April 7, 2025 (ECF No. 1).  On June 6, 2025, Defendants moved to dismiss LaScala's original complaint (ECF No. 22), and on August 4, 2025, LaScala filed his Amended Complaint (FAC). Defendants moved to dismiss the Amended Complaint on August 25, 2025 and filed a memorandum in support.  (ECF No. 35 ("Mem.").)  LaScala filed an opposition (ECF No. 41 ("Opp.")), and Defendants filed a reply in further support of dismissal (ECF No. 42 ("Reply")).

## II.    Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  However, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quotation marks omitted).  "[T]he Supreme Court has established the following order to be followed in determining whether the pleading is adequate:  'When there are well-pleaded factual allegations,

6

a court should assume their veracity and *then* determine whether they plausibly give rise to an entitlement to relief.'" *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679).  In undertaking this analysis, courts must "construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff." *Arar v. Ashcroft*, 585 F.3d 559, 567 (2d Cir. 2009).

## III.    Discussion

### A.    Timeliness of LaScala's Claims Under the ADA

Defendants argue that at least some of LaScala's claims are barred by the ADA's statute of limitations.  (Mem. at 27-28.)  "As a predicate to filing suit under the ADA, a plaintiff must first file a timely charge with the [EEOC] or a state or local agency capable of granting relief." *Clark v. Jewish Childcare Ass'n, Inc.*, 96 F. Supp. 3d 237, 258 (S.D.N.Y. 2015) (quotation marks omitted).  As applied to New York, the ADA requires that plaintiffs file a charge of discrimination within three hundred days of when the allegedly unlawful employment practice occurred.  *See* 29 U.S.C. § 626(d)(1).  "This 300-day time bar operates as a statute of limitations for ADA claims." *Kleinman v. Fashion Inst. of Tech.*, No. 16-CV-4348, 2017 WL 3016940, at *7 (S.D.N.Y. July 14, 2017) (cleaned up).

It is undisputed that LaScala filed a charge of discrimination with the EEOC on October 6, 2023.  (FAC ¶ 147.)  Thus, any unlawful employment actions that LaScala alleges took place before December 10, 2022—*i.e.*, three hundred days before October 6, 2023—are time-barred under the ADA.  Guidehouse contends that this statute of limitations bars LaScala's claims based on (1) any supposed failure to accommodate in March 2022, (2) the restructuring of the "Financial Crime Managed Services" sub-practice in summer or early fall of 2022, and (3) Guidehouse's refusal to promote LaScala to Zimiles's position, which Guidehouse alleges

7

LaScala first became aware of in late November of 2022.  (Mem. at 28.)

Guidehouse is correct that the ADA's statute of limitations bars LaScala's claims insofar as they are based on the restructuring of the "Financial Crime Managed Services" sub-practice, which took place months before December 10, 2022.  (FAC ¶ 63.)  LaScala retorts that the reorganization was part of a "series of targeted adverse employment actions against him" and thus constituted a "continuing violation" of the ADA.  (Opp. at 27 (quotation marks omitted).)  But the Supreme Court has held that the "continuing violation" doctrine does not apply to "discrete acts" by an employer.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) ("Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'").  LaScala cannot circumvent this requirement simply by grouping the restructuring—a discrete action with an identifiable date of occurrence—together with other allegedly adverse events.

The statute of limitations, however, does not bar LaScala's claims based on Guidehouse's failure to accommodate in March 2022 or its refusal to promote LaScala to Zimiles's position.  LaScala's Amended Complaint makes plain that, although he first sought a reasonable accommodation from Guidehouse around March 2022, those conversations continued into 2023.  (FAC ¶¶ 60-62.)  LaScala does not allege that Guidehouse outright denied his request for a reasonable accommodation in March 2022. [3]  And Guidehouse points to nothing in the Amended Complaint suggesting that LaScala should have known, prior to December 10, 2022, that no reasonable accommodation was forthcoming.  Put simply, Guidehouse identifies no discrete

---

[3] This also distinguishes LaScala's situation from the plaintiff's in *Elmenayer v. ABF Freight Systems, Inc.*, on which Guidehouse relies.  There, the employer "verbally informed [the plaintiff] that the requested accommodation would not be granted," and that rejection triggered the running of the ADA's statute of limitations.  318 F.3d 130, 132, 134 (2d Cir. 2003).

rejection of his accommodation request that would trigger the 300-day clock, and it appears from the Amended Complaint that conversations between LaScala and Guidehouse about potential accommodations continued into 2023—past the limitations period.  The Amended Complaint thus alleges sufficient facts to indicate that the purportedly unlawful employment practice (namely, Guidehouse's constructive denial of LaScala's accommodation request) did not take place until after December 10, 2022.

Separately, Guidehouse contends that any claim based on its failure to promote LaScala to Zimiles's position should be dismissed as time-barred because "Plaintiff admits that he learned he was not being considered for Ms. Zimiles's role as early as 'late-November' 2022." (Opp. at 28 (citing FAC ¶ 91).)  But the Amended Complaint states that Zimiles informed LaScala that company executives were disinclined to promote him on account of his health issues sometime "in late-November or early-December 2022," a date range that could include days after December 10, 2022.  (FAC ¶ 91.)  Moreover, the search for Zimiles's successor continued into February 2023, at which point Zimiles again informed LaScala that his health issues may impede his promotion.  (*Id.* ¶¶ 95-96.)  Given the Court's obligation to read LaScala's allegations "in the light most favorable to the plaintiff," *Arar*, 585 F.3d at 567, these facts suggest that LaScala did not have constructive notice of Guidehouse's decision not to promote him until after December 10, 2022.  This counsels against dismissal at this juncture. *See also Canon U.S.A., Inc. v. Cavin's Bus. Sols., Inc.*, 208 F. Supp. 3d 494, 501 (E.D.N.Y. 2016) ("District courts have not dismissed actions as untimely on Rule 12(b)(6) motions unless the complaint shows clearly that a claim is not timely." (quotation marks omitted)).

Accordingly, given the ADA's statute of limitations, LaScala's ADA claims premised on the restructuring of the "Financial Crime Managed Services" sub-practice in summer or early fall

of 2022 are dismissed as untimely.  Defendants have not shown, for the purposes of this motion, that the remaining unlawful employment practices that LaScala alleges are untimely.

### B.    Disability Discrimination Under the ADA

The ADA prohibits discrimination on the basis of disability in the "terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  LaScala appears to assert both a "failure to accommodate" theory and an "adverse employment" theory of discrimination.  (FAC ¶¶ 22, 83.)

### 1.    Failure to Accommodate

Under the ADA, an employer is required to reasonably accommodate an employee's known disability unless that accommodation would impose an undue hardship on the employer. *See id.* § 12112(b)(5)(A).  To make out a prima facie case of discrimination based on a "failure to accommodate" theory, LaScala must establish by a preponderance of the evidence that "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) his employer refused to make a reasonable accommodation." *Tudor v. Whitehall Cent. Sch. Dist.*, 132 F.4th 242, 246 (2d Cir. 2025) (cleaned up).[4]  "A plaintiff's burden at this prima facie stage is *de minimis*." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).

Defendants contend that LaScala has failed to allege a qualifying disability under the ADA.  (Mem. at 23.)  Instead, Defendants argue, LaScala alleges a "grab bag of maladies" without specifying which ones "constitute the requisite statutory physical or mental impairment" or clarifying how long each impairment lasted.  (*Id.*)  But Defendants read a more burdensome pleading requirement into the ADA than what is required.  The ADA defines a disability in three

---

[4] No party disputes that Guidehouse is subject to the ADA.

ways: (1) "a physical or mental impairment that substantially limits one or more major life activities" of an individual; (2) "a record of such an impairment"; or (3) "being regarded as having such impairment." 42 U.S.C. § 12102(1). "Th[is] definition of disability [is to be] construed in favor of broad coverage." *Id.* § 12102(4)(A). "To determine whether or not a plaintiff suffers from a disability, the Supreme Court compels district courts to follow a three-step process to conclude: '(1) whether plaintiff had an impairment; (2) whether the impairment affected a "major life activity" within the meaning of the ADA; and (3) whether that major life activity was substantially limited by the impairment.'" *Laface v. E. Suffolk Boces*, 349 F. Supp. 3d 126, 145 (E.D.N.Y. 2018) (quoting *Mazza v. Bratton*, 108 F. Supp. 2d 167, 173 (E.D.N.Y. 2000)).

LaScala has plausibly alleged facts sufficient to meet all three of these steps. He states that COVID-19 left him with "kidney issues, chronic migraines, and other symptoms," among them "fatigue and difficulty sleeping," that lasted throughout 2021. (FAC ¶¶ 57-58.) After contracting COVID-19 for a second time, LaScala's health worsened, and he experienced "migraines, kidney issues, fatigue, temporary hearing loss, back and knee problems, coughing and perspiration, and problems sleeping," as well as deteriorating mobility that necessitated the use of a cane. (*Id.* ¶¶ 58, 82, 85.) Certainly, LaScala's Amended Complaint would have benefited from additional details about the severity and duration of particular symptoms, as well as the cumulative impact of these impairments on LaScala's major life activities. But LaScala's allegations show that his impairments substantially limited various "major life activities," including sleeping and walking, as well as the operation of LaScala's lymphatic and musculoskeletal systems. *See* 29 C.F.R. § 1630.2(h)(1) (listing examples of physical or mental impairments to include conditions that affect lymphatic and musculoskeletal systems); *id.*

11

§ 1630.2(i)(1)(i) (listing examples of major life activities to include sleeping and walking); *Quintero v. Rite Aid of New York, Inc.*, No. 09-CV-6084, 2011 WL 5529818, at *8 (S.D.N.Y. Nov. 10, 2011) (noting that, "[e]ven though [the EEOC's] administrative regulations are not binding, courts in the Second Circuit afford them great deference").

LaScala has also sufficiently alleged that he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation. LaScala explains that, in his role, he was responsible for an approximately $40 million book of business for clients, was closely involved with Guidehouse's Managed Services business, handled projects for the company's executives and for Zimiles, and oversaw various legal, risk management, and human resources issues for Guidehouse. (FAC ¶¶ 47-49.) Moreover, LaScala alleges that, despite his health problems after contracting COVID-19 and Guidehouse's refusal to offer him a reasonable accommodation, "LaScala continued working fourteen-hour-plus days," prioritized his team and work for the company, and delivered "concrete financial results in the multi-millions" until he sought short-term disability leave in March 2023. (*Id.* ¶ 59; *see also id.* ¶¶ 62, 88, 94.) This is sufficient, at this stage, to allege that LaScala was qualified to perform the essential functions of his job. *Cf. Crosby v. Stew Leonard's Yonkers LLC*, 695 F. Supp. 3d 551, 569 (S.D.N.Y. 2023) (denying a motion to dismiss, although the plaintiff's "allegations regarding his ability to perform the essential functions of the position were slim," because the plaintiff plausibly alleged that working remotely allowed him to perform the essential functions of his job "while suffering from numerous symptoms of Long Haul COVID-19"); *see also Cangro v. New York City Dep't of Fin.*, No. 23-CV-10097, 2024 WL 3833971, at *5 (S.D.N.Y. Aug. 14, 2024) (noting that, because the determination of a job's essential functions "requires a fact intensive analysis," such an assessment "is often ill-suited for resolution on a motion to dismiss" (quotation marks

omitted)).

Finally, it is undisputed that Guidehouse did not ultimately offer LaScala a reasonable accommodation, despite several months of discussions.  (FAC ¶¶ 60-61.)  Although Defendants bemoan the dearth of detail in the Amended Complaint as to the nature of these discussions, that dearth of detail does not render LaScala's allegations conclusory.  Because LaScala has sufficiently alleged that Guidehouse failed to reasonably accommodate his disability in violation of the ADA, Defendants' motion to dismiss is denied as to this claim.

### 2.    Adverse Employment Action

To make out a prima facie case of discrimination based on an "adverse employment action" theory under the ADA, LaScala must establish that: "(1) the defendant is covered by the ADA; (2) plaintiff suffers from or is regarded as suffering from a disability within the meaning of the ADA; (3) plaintiff was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of his disability or perceived disability." *Kinneary v. City of New York*, 601 F.3d 151, 156 (2d Cir. 2010).  Under the ADA, a plaintiff experiences an adverse employment action "because of" his disability if, "'but for' the disability, the adverse action would not have been taken." *Natofsky v. City of New York*, 921 F.3d 337, 347 (2d Cir. 2019).  An ADA plaintiff need only "'give plausible support to a minimal inference of discriminatory motivation' at the pleading stage." *Dooley v. JetBlue Airways Corp.*, 636 F. App'x 16, 21 (2d Cir. 2015) (summary order) (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015)).

LaScala alleges that, after he notified Guidehouse of his health problems in late winter 2021, the company took a series of adverse actions against him by: (1) restructuring the company in mid-December 2022 in a way that dramatically increased his workload, (2) passing over

13

LaScala for promotion to Zimiles's role following her retirement, (3) demoting LaScala from an E-2 to E-1 partner on the same day that he sought and was approved for short-term disability leave, and (4) terminating LaScala the day before he was scheduled to begin his long-term disability leave.  (FAC ¶¶ 69, 71-72, 91, 103, 121.)  Defendants do not appear to contest that these actions qualify as "adverse employment actions" for the purposes of the ADA.  *See Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (stating that examples of adverse employment actions include "a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation" (cleaned up)).

As a threshold matter, Defendants are correct that LaScala cannot stake a discrimination claim on his termination because he has not shown that he was, at that time, "qualified to perform the essential functions of the job, with or without reasonable accommodation." *Kinneary*, 601 F.3d at 156 (quotation marks omitted); *see also Silver v. Entergy Nuclear Operations, Inc.*, 290 F. Supp. 3d 234, 244 (S.D.N.Y. 2017) (stating that the inquiry as to whether a plaintiff is a "qualified individual" for the purposes of the ADA "is made with respect to the individual's condition at the time of the alleged adverse employment action").  (FAC ¶¶ 121, 158.)  No party disputes that, at the time of LaScala's firing, he had been unable to work since March 10, 2023, and was scheduled to embark on long-term disability leave with no ascertainable end date.  (*Id.* ¶¶ 101, 102, 114-15.)  Nor do La Scala's allegations supply any basis for believing that, following a longer disability leave, LaScala would have been able to fulfill the requirements of his role.  Instead, LaScala alleges that, at the time of his termination, "he was continuing to strive for improvements in his health" and "wished to attempt to recover from his disability" so that he could return to work "if and when his health situation improved."

(Opp. at 19-20 (quotation marks and alterations omitted).)  But as other courts in this circuit have concluded, "a person who is on disability leave because he is disabled from performing his job is not 'otherwise qualified' to perform its essential functions, and therefore cannot establish a claim of disability-based discrimination, in the absence of some evidence that a reasonable accommodation exists." *Dansler-Hill v. Rochester Inst. of Tech.*, 764 F. Supp. 2d 577, 583 (W.D.N.Y. 2011); *see also Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 338 (2d Cir. 2000) ("The duty to make reasonable accommodations does not, of course, require an employer to hold an injured employee's position open indefinitely while the employee attempts to recover.").[5] Thus, because LaScala has not shown that he was "otherwise qualified" to perform the essential functions of his job at the time of his termination, that termination cannot form the basis of a disability claim under the ADA.

LaScala has pleaded sufficient facts, however, to support "a minimal inference of discriminatory motivation" as to each of the remaining adverse employment actions. *Dooley*, 636 F. App'x at 21 (quoting *Vega*, 801 F.3d at 84).  LaScala alleges facts demonstrating that Guidehouse's restructuring was implemented unfairly as to him in particular:  LaScala's business horizontal was the only one that was not staffed with additional Line Partners, and while non-disabled comparator partners were required only "to pursue, sell, and deliver to an internal line of business," LaScala was "simultaneously responsible for running and overseeing both (i) the

---

[5] LaScala relies on *Parker* for the proposition that "[t]erminating a disabled employee . . . who can perform the essential functions of the job but cannot return to work because the employer has denied his request for reasonable accommodation, is disability discrimination under the ADA." 204 F.3d at 338.  But this reliance is misplaced.  In *Parker*, the record contained evidence that the plaintiff "had recovered enough to resume his duties with some accommodation" following his short-term disability leave, but that his employer summarily denied that accommodation request. *Id.*  Here, LaScala provides no indication that he would have been able to return to his duties with some accommodation following his long-term disability leave.

Financial Services Segment of the horizontal, and (ii) the fully matured GIC consulting business" as a result of the restructuring. (FAC ¶ 71.) LaScala's allegations also raise an inference of discriminatory motivation underlying Guidehouse's refusal to consider him for Zimiles's position. LaScala provides ample detail of his industry experience and strong record of performance at Guidehouse, states that he was generating significant profit and revenue for the company into early 2023, and alleges that "he had essentially been groomed for the Zimiles role over the years." (*Id.* ¶¶ 54-55, 94, 97.) Nevertheless, Zimiles and Guidehouse executives declined to consider him for the position and explicitly referenced his health issues as a basis for doing so. (*Id.* ¶¶ 91, 95-96.) Additionally, LaScala's allegations that he was demoted from an E-2 to E-1 partner on the same day he was approved for short-term disability leave, despite his strong performance at the company and the increased responsibilities foisted upon him by the restructuring, also suffice to state a claim of ADA discrimination at this juncture. (*Id.* ¶ 103.)

Because LaScala has met his "*de minimis*" burden to allege a prima facie case of discrimination based on these adverse employment actions under the ADA, *see Treglia*, 313 F.3d at 719, Defendants' motion to dismiss is denied as to these claims.

### C.    Retaliation Under the ADA

"To establish a prima facie case of retaliation under the ADA, a plaintiff must establish that (1) the employee was engaged in an activity protected by the ADA, (2) the employer was aware of that activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action." *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999). "A causal connection in retaliation claims can be shown either '(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial

16

evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'" *Littlejohn v. City of New York*, 795 F.3d 297, 319 (2d Cir. 2015) (quoting *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).

LaScala's allegations of retaliation are difficult to parse. At points, LaScala appears to allege that Guidehouse retaliated against him for taking disability leave by taking adverse actions—including passing him over for promotion—that predate his disability leave. (*See, e.g.*, FAC ¶ 158.) LaScala, however, "does not dispute the non-controversial position that there can be no legally viable causal connection between an adverse action and a protected activity where the former happened before the latter." (Opp. at 22.) Thus, as best as the Court can understand, the Amended Complaint alleges that the following adverse employment actions were undertaken retaliatorily in response to LaScala's taking disability leave in March 2023 and his formal raising of potential discrimination claims through counsel against Guidehouse in early June 2023: (1) LaScala's demotion from an E-2 to E-1 partner on March 8, 2023, (2) Guidehouse's abrupt withdrawal of its proposed settlement agreement in September 2023, (3) LaScala's termination on September 8, 2023, and (4) Guidehouse's refusal to pay LaScala his net profit share of the proceeds from its acquisition by Bain Capital, as well as other distributions that LaScala alleges he is owed. (FAC ¶¶ 121, 129, 136, 158.)

Of these events, LaScala has pleaded sufficient facts to suggest retaliatory intent only as to his demotion from an E-2 to E-1 partner on March 8, 2023. LaScala alleges that Guidehouse notified employees of LaScala's demotion on the very day LaScala first requested disability leave, that the demotion was to take effect two days after he began his short-term disability leave, and that, given LaScala's outsize responsibilities and workload compared to other E-1

17

partners, there was no justification for such a demotion.  (*Id.* ¶¶ 101, 103-104.)  Defendants contend that the demotion had in fact been set in motion months before (Mem. at 27), but this is not clear from the face of the Amended Complaint—and in any case, goes to questions of fact not suitable for determination at this stage.

LaScala has not pleaded sufficient facts, however, to suggest a causal connection between the remaining adverse events and his protected activities.  Several months elapsed between LaScala's decision to take disability leave (in March 2023), his decision to formally raise potential legal claims against Guidehouse (in June 2023), LaScala's termination (in September 2023), and Guidehouse's refusal to pay LaScala profit shares and distributions (following his termination).  (FAC ¶¶ 100, 116, 136.)  And while some of the alleged adverse employment actions took place close in time to some protected activities—including, for example, Guidehouse's revocation of its settlement offer and LaScala's termination—LaScala points to no facts suggesting that these events were motivated by LaScala's decision to engage in protected activity.  Instead, LaScala relies on conclusory allegations about Guidehouse's purportedly retaliatory motivations.  (*See, e.g.*, *id.* ¶¶ 121, 129, 136.)  Such threadbare allegations do not plausibly support an inference of retaliatory intent.

Accordingly, Defendants' motion to dismiss is denied as to LaScala's retaliation claim insofar as it is based on LaScala's demotion from E-2 to E-1 partner on March 8, 2023, and otherwise granted.

### D.       Discrimination and Retaliation Under the NYCHRL and NYSHRL

#### 1.       Against Guidehouse

Because LaScala alleges sufficient facts to establish liability against Guidehouse for discrimination (based on a failure to accommodate LaScala's disability, the mid-December 2022

restructuring, Guidehouse's refusal to promote LaScala, and LaScala's demotion from E-1 to E-2 partner) and retaliation (based on LaScala's demotion from E-2 to E-1 partner) under the ADA, the same is true for his discrimination and retaliation claims under the NYCHRL and NYSHRL. (*See id.* ¶¶ 171-75, 187-91.) "A claim of disability discrimination under the [NYSHRL] is governed by the same legal standards as govern federal ADA claims. Thus, to the extent that [the plaintiff] brings a state-law disability-discrimination claim, it survives or fails on the same basis as his ADA claim." *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 n.3 (2d Cir. 2006) (internal citations omitted). The same is true of retaliation claims under the NYSHRL. *See Treglia*, 313 F.3d at 719. Additionally, "although different standards govern NYCHRL claims, a 'one-way ratchet' exists, where the ADA constitutes a '*floor* below which the [NYCHRL] cannot fall.'" *O'Rourke v. Drunken Chicken in NY Corp.*, No. 19-CV-3942, 2020 WL 4013187, at *5 (E.D.N.Y. July 16, 2020) (quoting *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009)).

The NYCHRL and NYSHRL, however, have a longer limitations period than the ADA. "Claims brought under the NYSHRL and NYCHRL are subject to a three-year statute of limitations, which is tolled for the period between the filing of an EEOC charge and the issuance by the EEOC of a right-to-sue letter." *DeNigris v. New York City Health & Hosps. Corp.*, 861 F. Supp. 2d 185, 192 (S.D.N.Y. 2012). Thus, while the Court dismissed as time-barred any ADA claim premised on the restructuring of the "Financial Crime Managed Services" sub-practice in summer or early fall of 2022, it may properly consider that restructuring under the NYCHRL and NYSHRL. (*See* FAC ¶¶ 147-48.)

The Court concludes that LaScala has stated claims of disability discrimination and retaliation under the NYCHRL and NYSHRL as to the restructuring. LaScala alleges that, a few

months after he first sought an accommodation, the "Financial Crime Managed Services" sub-practice was abruptly moved out of his GIC practice.  (*Id.* ¶ 63.)  Moreover, although other practices that ran managed service teams "were allowed to keep their respective teams embedded in their lines of business," LaScala's was not, and Guidehouse provided no explanation for the discrepancy.  (*Id.* ¶ 68.)  These allegations are sufficient to raise "a minimal inference of discriminatory motivation."  *Dooley*, 636 F. App'x at 21 (quotation marks omitted).  They also plausibly support an inference of retaliatory intent.

Accordingly, Defendants' motion to dismiss is denied as to LaScala's state law discrimination and retaliation claims insofar as those claims mirror LaScala's surviving ADA claims.  Defendants' motion to dismiss is also denied insofar as LaScala's state law claims are predicated on the restructuring of the "Financial Crime Managed Services" sub-practice in summer or early fall of 2022.

### 2.    Against Individual Defendants

It is unclear from the Amended Complaint whether LaScala brings aiding-and-abetting claims against McIntyre and Zimiles under the NYCHRL and NYSHRL, in addition to direct liability claims against both individuals under the NYCHRL.  (*See* FAC ¶¶ 164-166, 180-182.)  *See generally Doe v. Bloomberg, L.P.*, 167 N.E.3d 454, 457-60 (N.Y. 2021) (clarifying that individual employees cannot be held directly liable under the NYSHRL); *see also Belyea v. City of Glen Cove*, No. 20-CV-5675, 2023 WL 1929787, at *2 (E.D.N.Y. Feb. 10, 2023).  Because LaScala suggests in his briefing that he brings both aiding-and-abetting and direct claims against McIntyre and Zimiles, however, the Court considers them both.  (*See* Opp. at 27-28.)

Under the NYSHRL and NYCHRL, "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this

[provision], or to attempt to do so." N.Y. Exec. Law § 296(6); Admin. Code City N.Y. § 8-107(6). "Aiding and abetting claims under the NYCHRL and the NYSHRL are governed by the same standard," *Eur. v. Equinox Holdings, Inc.*, No. 20-CV-7787, 2022 WL 4124763, at *11 (S.D.N.Y. Sept. 9, 2022), which "requires that the aider and abettor share the intent or purpose of the principal actor," *Xiang v. Eagle Enters., LLC*, No. 19-CV-1752, 2020 WL 248941, at *6 (S.D.N.Y. Jan. 16, 2020) (quotation marks omitted). Moreover, under the NYCHRL, "an individual defendant, although not qualifying as an employer, may be held liable for discrimination either (1) directly, for his own participation in discrimination, or (2) for aiding and abetting other liable persons (including the employer)." *Nezaj v. PS450 Bar & Rest.*, 719 F. Supp. 3d 318, 330 (S.D.N.Y. 2024).

LaScala has pleaded sufficient facts to establish aiding-and-abetting liability against McIntyre and Zimiles under both statutes and to establish direct individual liability against both individuals under the NYCHRL. As previously discussed, LaScala has stated a claim under state law that Guidehouse discriminated against him by failing to reasonably accommodate his disability, restructuring the company on two occasions in ways that disproportionately impacted LaScala, failing to promote LaScala to Zimiles's role, and demoting LaScala from an E-2 to an E-1 partner. LaScala has also stated a claim that the restructuring of the "Financial Crime Managed Services" sub-practice in summer or early fall of 2022 and his demotion to an E-1 partner constituted retaliation against him for engaging in a protected activity. According to the Amended Complaint, Zimiles and McIntyre played a role in several of these events. LaScala alleges that he raised his health issues with Zimiles in addition to a human resources liaison when he sought an accommodation (FAC ¶¶ 61-62), that Zimiles informed him that both she and the company's C-suite team did not think promoting LaScala was a good idea because of his

21

health (*id.* ¶¶ 91, 95), and that McIntyre tasked him with preparing the restructuring plan that would disproportionately increase his workload (*id.* ¶ 69).  LaScala also alleges that Zimiles "cultivated the C-suite team's perception that LaScala could not properly do his job because of his health," including by making false claims about his performance (*id.* ¶¶ 12, 79), and discouraged LaScala from returning to the company during his short-term disability leave (*id.* ¶¶ 15, 107).  Moreover, LaScala alleges that McIntyre "supervised LaScala's work for Guidehouse and had authority regarding the terms and conditions of LaScala's employment," presumably including decision-making power over his partner rank and prospects of promotion. (*Id.* ¶ 30.)

In short, LaScala has stated a claim that Zimiles and McIntyre aided and abetted Guidehouse's discriminatory and retaliatory treatment of LaScala or directly participated in such conduct.  Accordingly, Defendants' motion to dismiss is denied as to these claims.

**E.      Hostile Work Environment Under the ADA, NYCHRL, and NYSHRL**

LaScala also appears to bring hostile work environment claims under the ADA, NYSHRL, and NYCHRL.  (FAC ¶¶ 1, 3, 166, 182.)  Defendants make no mention of this claim in their motion to dismiss, but the Amended Complaint plainly does not allege sufficient facts to support such a claim.  To prevail on a hostile work environment claim under the ADA, LaScala must show "(1) that the harassment was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment, and (2) that a specific basis exists for imputing the objectionable conduct to the employer."  *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 74 (2d Cir. 2019) (cleaned up); *see also Peterson v. New York City Dep't of Educ.*, No. 18-CV-1515, 2020 WL 2559835, at \*10 (E.D.N.Y. May 20, 2020) ("The elements of a hostile work environment claim are identical under the ADA and NYSHRL.").

At most, LaScala alleges that Zimiles treated him in a hostile manner during his short-term disability leave by scheduling check-in phone calls and sending him unwanted books about mental health.  (FAC ¶ 106.)  But this allegation, without more, cannot sustain a hostile work environment claim, even under the NYCHRL's more permissive standard.  *See Williams v. New York City Hous. Auth.*, 61 A.D.3d 62, 79 (1st Dep't 2009) (cautioning that the NYCHRL is not meant to "operate as a general civility code" (quotation marks omitted)).  Accordingly, LaScala's hostile work environment claims are dismissed for failure to state a claim.

### F.    Breach of Contract

LaScala asserts that Guidehouse Holdings materially breached § 4.1(a) and § 4.5 of the Fifth Amended & Restated Limited Liability Company Operating Agreement (the "Fifth Amended Operating Agreement") by "failing to pay LaScala his net profit share of the proceeds from the Bain Capital acquisition and to pay other distributions that he is owed in connection with his Membership Interests; and by failing to return to LaScala remaining contribution and other capital account amounts relating to the Membership Interests."  (FAC ¶ 216.)  Under Delaware law,[6] the elements of a breach of contract are: "(1) the existence of a contract; (2) a breach of an obligation imposed by that contract; and (3) [ ] damages."  *Adviser Invs., LLC v. Powell*, No. 22-CV-1149, 2023 WL 6383242, at *8 (Del. Ch. Sept. 29, 2023) (quotation marks omitted).

Defendants argue that LaScala has identified no contractual right in the agreement to a return of "remaining contributions and other capital account amounts relating to [his] Membership Interests."  (FAC ¶ 216; Mem. at 16.)  But Defendants point to no provision that

---

[6] The Fifth Amended Operating Agreement contains a choice-of-law provision stating that it is governed by Delaware law.  (*See* ECF No. 30-5 ¶ 13.15.)

obviously forecloses the possibility that LaScala can recover contribution and capital account amounts under the language of § 4.1(a) and § 4.5. To the contrary, § 4.1(a) suggests that the net profits that LaScala alleges he is owed were allocated to his capital account. (See ECF No. 30-5 § 4.1(a).) In any event, absent a clearer indication that LaScala's claim for "remaining contributions and other capital account amounts" is not covered by § 4.1(a) and § 4.5, Defendants' argument does not doom his breach-of-contract claim.

Defendants also contend that the Fifth Amended Operating Agreement, which superseded the Fourth Amended Operating Agreement, explicitly requires that LaScala sign a release of claims with Guidehouse Holdings LLC as a condition precedent to receiving any distributions. (See FAC ¶ 137-38.) Specifically, the provision states: "Notwithstanding anything to the contrary set forth herein, as a condition to the receipt by any Management Member of any Distribution hereunder, such Management Member must sign a release of claims against the Company and the Company Group in the form provided by or on behalf of the Company." (ECF No. 30-5 § 4.5(f).) LaScala concedes that he did not sign a release of claims against Guidehouse, but argues that the insertion of this requirement in the Fifth Amended Operating Agreement was "improper and invalid" because, pursuant to § 12.1 of the preceding Fourth Amended Operating Agreement, such an amendment required his prior written consent. (FAC ¶¶ 139-40.) Section 12.1 of the Fourth Amended Operating Agreement provided, in turn:

> Except as otherwise provided in Section 3.3, this Agreement may not be amended without the prior written consent of . . . each affected Class A Member and Class B Member to the extent any such amendment (i) adversely affects such Member's Membership Interest (except as otherwise permitted pursuant to this Agreement), (ii) adversely affects any payment to which such Member has become entitled pursuant to this Agreement, (iii) adversely affects the rights of such Member under Article VIII hereof (and related definitions), (iv) adversely affects in any material respect the rights of such Member under this Agreement, or (v) increases or extends any financial obligation or duty or liability of such Member beyond that set forth herein or permitted hereby, for each of clauses (i) through (v) of this Section 12.1, in a manner disproportionate as

24

compared to the other Members of the same class of Membership Interests. (ECF No. 30-2 § 12.1.)

Thus, the nub of the parties' dispute is whether the "release-of-claims" requirement "adversely affect[ed]" LaScala "in a manner disproportionate as compared to the other Members of the same class of Membership Interests," such that his written prior consent was required for the amendment to take effect. (*Id.*) Defendants argue that the "release-of-claims" requirement applies equally to *any* distribution to *any* current or former employee, and so cannot by its terms have a disproportionate impact on LaScala. (Mem. at 18.) But a facially neutral requirement may still have a disproportionate effect on individual members. And LaScala has sufficiently alleged that, because he had already filed a Charge of Discrimination with the EEOC before the November 2023 amendment to the Operating Agreement, that amendment disproportionately affected him as compared to other members. (Opp. at 30.)

Accordingly, because LaScala has stated a claim that Guidehouse breached the Fifth Amended Operating Agreement,[7] Defendants' motion to dismiss is denied as to LaScala's breach-of-contract claim.

### G.    Breach of the Implied Covenant of Good Faith and Fair Dealing

Finally, LaScala asserts that Guidehouse Inc. breached the implied covenant of good faith and fair dealing in his employment agreement by abruptly rescinding its proposed settlement agreement before LaScala's 21-day consideration period had elapsed and then terminating LaScala on September 8, 2023. (FAC ¶¶ 200, 202.) "To state a claim of breach of the implied covenant of good faith and fair dealing, a plaintiff must allege (1) a specific implied contractual obligation, (2) a breach of that obligation by the defendant, and (3) resulting damage to the

---

[7] No party disputes that LaScala has pleaded the existence of a contract and damages.

plaintiff." *vMedex, Inc. v. TDS Operating, Inc.*, No. 18-CV-1662, 2020 WL 4925512, at *8 (D. Del. Aug. 21, 2020).[8]

LaScala's claim fails as a matter of law. "The implied covenant only applies where a contract lacks specific language governing an issue and where the implied term does not override the express terms of a contract." *Id.* (quotation marks omitted). LaScala admits, however, that his employment contract expressly allowed Guidehouse to terminate an employee who is unable to work for a continuous ninety-day period due to disability. (ECF No. 30-1 ¶ 3(e); Opp. at 31.) And at the time of his termination, LaScala had been on disability leave since March 10, 2023, well over ninety days before his termination. (FAC ¶ 101.) This is fatal to his claim. *See Khushaim v. Tullow Inc.*, No. CV N15C-11-212, 2016 WL 3594752, at *4 (Del. Super. Ct. June 27, 2016) ("[W]here the contract specifically addresses the alleged misconduct, its terms will be applied and an implied covenant claim will not stand."); *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) ("Existing contract terms control, however, such that implied good faith cannot be used to circumvent the parties' bargain[.]"). The fact that the proposed (and later rescinded) settlement agreement would have extended LaScala's employment to a date in October 2023 does not change this outcome: LaScala concedes that the proposed settlement agreement was "still under advisement" when Guidehouse withdrew it. (FAC ¶ 121.) The proposed agreement therefore had no binding effect on either party and cannot sustain a claim for breach.

Accordingly, LaScala's claim for breach of the implied covenant of good faith and fair dealing is dismissed for failure to state a claim.

---

[8] LaScala's employment agreement also contains a choice-of-law provision stating that it is governed by Delaware law. (*See* ECF No. 30-1 ¶ 20.)

26

**IV.    Conclusion**

For the foregoing reasons, Defendants' motion to dismiss the Amended Complaint (ECF No. 34) is GRANTED in part and DENIED in part.  LaScala's disability discrimination claims under the ADA are dismissed with prejudice insofar as they are predicated on (1) Guidehouse's first restructuring in the summer or early fall of 2022 or (2) LaScala's termination on September 8, 2023.  LaScala's retaliation claims under the ADA are dismissed with prejudice insofar as they are predicated on (1) Guidehouse's withdrawal of its proposed settlement agreement, (2) LaScala's termination, or (3) Guidehouse's refusal to pay LaScala his net profit share following its acquisition by Bain Capital and other distributions LaScala alleges he is owed.  LaScala's disability discrimination and retaliation claims under the NYCHRL and NYSHRL are dismissed with prejudice insofar as they parallel claims dismissed under the ADA, with the exception of any state law claims premised on Guidehouse's first restructuring in the summer or early fall of 2022.  Finally, LaScala's claims asserting hostile work environment and breach of the implied covenant of good faith and fair dealing are dismissed with prejudice for failure to state a claim.  Defendants' motion is DENIED as to all other claims.

Defendants' motion to dismiss the original complaint (ECF No. 22) is denied as moot.

Defendants shall file an answer to the remaining claims within 14 days after the date of this Opinion and Order.  *See* Fed. R. Civ. P. 12(a)(4)(A).

The Clerk of Court is directed to close the motions at Docket Numbers 22 and 34.

SO ORDERED.

Dated: March 20, 2026
      New York, New York

_____
J. PAUL OETKEN
United States District Judge

27